[File No. 6394.]

ACME COMMISSION COMPANY, Inc., a Corporation, Respondent, v. MANDAN CREAMERY & PRODUCE COMPANY, a Corporation, Appellant.

(266 N. W. 112.)

Opinion filed March 18, 1936.

*Sullivan, Fleck & Sullivan,* for appellant.

*Dullam & Young,* for respondent.

BURKE, Ch. J. The defendant, the Mandan Creamery and Produce Company, is a corporation engaged in the business of buying poultry, butter, cream, and other farm products for resale. The plaintiff,

Acme Commission Company, is a commission firm, in the city of New York, engaged in the business of selling poultry on commission.

The complaint alleges that on the 13th day of October, 1932 the defendant shipped to the plaintiff a carload of poultry to be sold by plaintiff on commission, drawing on the plaintiff at said time for the sum of $1,725 as an advancement on the proceeds of the sale; that plaintiff received the said car of poultry, sold the same on the market at and for the best price then obtainable, and paid for and on behalf of the defendant for the freight, coops, cartage, unloading, advances to man in charge, feed, and commission to plaintiff the sum of $972.22, which together with the draft amounted to $2,697.22 and was in excess of the amount received by the plaintiff for the poultry in the sum of $543.01, for which the plaintiff claims judgment.

The defendant, answering, admits the shipment of the poultry to the plaintiff, the receipt of the money in payment of the sight draft, and the costs and expenses in connection with the shipment and sale of poultry in New York, including the commission, but alleges that the defendant was induced to ship the poultry to the plaintiff on the belief that the plaintiff was engaged in the sole and exclusive business of handling poultry solely upon a commission basis and as a factor, and agreed with the defendant herein that if defendant would ship said car to the plaintiff that the plaintiff would receive this car and promptly and forthwith sell the car of poultry at the best possible available price upon receipt thereof by the plaintiff; that the poultry shipped to plaintiff was western range poultry, exceptionally vigorous and healthy and in very good marketable condition; that as a special inducement to this defendant to consign its poultry to this plaintiff, the plaintiff agreed to give to this car of poultry special and preferred attention, and care, and to forthwith sell the said poultry at the best possible available price promptly upon arrival in New York; that the said plaintiff advised the defendant, before the consignment of the said car to the plaintiff, that the plaintiff could handle said car to the best advantage the 18 or 19 of October, 1932; that said car of poultry reached the said plaintiff on the 18 of October, 1932, and at that time, without the knowledge of this defendant, the plaintiff had purchased for its own account, and for sale, many cars of poultry in

which the said plaintiff had the entire ownership, and many cars of poultry in which the plaintiff had investments equal to or in excess of the value thereof and instead of carrying out its contract with the defendant, and in breach of its obligations, and fraudulently and negligently, and with intent and purpose of preferring its own property and the property in which it had an interest and investment in excess of the value thereof, and to protect its own interest as against the interest of this defendant, and in direct violation of all of its obligations to this defendant, the plaintiff failed, neglected, and refused to sell the car belonging to the defendant upon arrival, but on the contrary held the car of defendant from the 18 of October, 1932 to the 22 of October, 1932, at which time the plaintiff sold the contents of the car, as alleged in the complaint; that had said property been sold on the 19 of October, 1932 plaintiff would have realized on the market then in force a sum in excess of $2,700; that if it had been sold for the highest price available on the 20 of October the plaintiff would have realized $2,567.55, and defendant is entitled to an accounting from the plaintiff upon the basis of the highest price of poultry on a date not later than October 20. The alleged fraud and wrongdoing of the plaintiff, in the handling of said car of poultry, is also alleged as a counterclaim and defendant demands, as damages against the plaintiff, the sum of $946.54.

By stipulation there was a trial to the court without a jury, who made findings of fact and conclusions of law favorable to the plaintiff, but allowed the defendant $151.75 damages for negligence in handling the poultry on the market. From a judgment duly entered the defendant appeals.

On October 11, 1932, the plaintiff wired the defendant at Mandan, North Dakota "Eighty one cars unloaded four carried twenty one arriving tomorrow two hundred cars listed for week outlook lower for end week would suggest sell car to good advantage enroute can use couple cars for next week." On October 13, 1932, two days later, the defendant sent to the plaintiff telegram, as follows: "Rolling you today car nineteen seven five principally heavy fowl." This car was received in New York on the evening of the 17 of October, 1932 after business hours and on October 18 the plaintiff wired defendant

as follows: "Two hundred twenty cars listed for week seventy five track today about fifty two arriving tomorrow market left open carrying car for tomorrow."

Mr. Russell, president of the Mandan Creamery and Produce Company, was in Detroit, Michigan when the foregoing telegram was received at Mandan, North Dakota. On October 19, 1932, at six p. m., Russell, while in Detroit, received from the Mandan Creamery and Produce Company a message as follows: "Live poultry from here 12 Acme arrived for unloading 18 Acme wired yesterday withholding unloading on account of surplus wired again today withholding unloading until tomorrow." On receipt of this message Russell called the Acme Commission Company by long distance telephone and there is a direct conflict between his testimony and the testimony of Abramson, who claims to have answered the telephone for the plaintiff. Russell states that on the morning of the 20 of October, 1932 he called the plaintiff on long distance and asked for Louis Spatz, with whom he had done business. He was told that Spatz was not there and the man answering the telephone was the bookkeeper. He asked if he could talk to him about the car of poultry and being answered in the affirmative he said: "What is the reason for your holding it there?" and he said: "The market is badly stuck, and we think we are doing you a favor by holding it on the track," and I said: "The situation in New York, according to the information I have, does not warrant your holding that on the track and I think you are doing somebody else a favor and I want you to sell this car of poultry today without any delay," and he said all right he would.

Mr. Abramson said he talked to Mr. Russell over long distance on the evening of the 19 of October. He testified that he is treasurer, office executive, and general manager of the business and that "Russell told me that he had received a telegram and he asked me what the prospects were of disposing of the poultry and I told him I thought it best to wait a day or two for a better market and he told me to use my best judgment and he hoped the market would improve."

According to the testimony of Russell he talked with the bookkeeper on the morning of the 20 of October and gave specific instructions to sell the car of poultry on that day. According to Abramson he was

not the bookkeeper, but the treasurer, office executive, and business manager and that Russell told him to use his best judgment and hoped the market would improve. Before this car of poultry was shipped, namely, October 11, plaintiff had wired the defendant that he could sell a car to good advantage enroute and could use a couple of cars for next week. Defendant claims that it was because of this telegram, stating that the defendant could use a couple of cars next week, that he shipped this car of poultry to plaintiff, at the same time sending the telegram "Rolling you today car nineteen seven five principally heavy fowl." He doesn't say in his telegram that they are "heavy western fowl," but he does say they are "principally heavy fowl." Abramson identified a publication entitled "Price-Current" for the 18, 19, and 20 of October, 1932, which was offered and received in evidence without objection. In fact, both plaintiff and defendant rely upon this publication as evidence showing the price of fowl on the 19 and 20 of October. The issue of the 18 of October does not have the price list but does have a statement showing large shipments of fowl received on the 18. On the 19 and 20 the price of heavy western fowl is listed at 17 cents on both days.

It is the contention of defendant that he should have received 17 cents per pound for the heavy western fowl, the price as listed in said "Price-Current" and the list price for fowl of other classes specified therein and that in each class the plaintiff's report of sale showed that there was a loss of two cents per pound. As proof of this he testified that on the same date he shipped a carload of poultry to the Dexter Poultry Company, which sold on the same day the western heavy fowl for 17¼ cents per pound and that 2¼ cents per pound should be added to the list price for the true market price.

Wayne Moore, who was in charge of the car, and Russell, also, testified that the poultry in the car shipped to the Dexter Poultry Company was purchased in the same neighborhood and was practically the same as the poultry shipped to the plaintiff.

The contention that the poultry in both cars was equal in all respects is not borne out by the report of sale furnished to the defendant by each company. In the Dexter Poultry Company report there are designated—fowl, 11,608 lbs. In the report of the plaintiff there are

designated—fowl, 10,886 lbs., or 722 lbs. less than in the Dexter Poultry Company report. In the Dexter Poultry Company report there are 1,088 lbs. of leghorn fowl, and in the plaintiff's report there are 1,535 lbs. of leghorn fowl, or 447 lbs. more of the leghorn variety shipped to the plaintiff. There are 2,800 lbs. of chickens in the plaintiff's report and no chickens designated in the Dexter Poultry Company report. There are 191 lbs. of ducks designated in the Dexter Poultry Company report and no ducks in the plaintiff's report, but 156 lbs. of geese. There are 531 lbs. of cox (cocks) in plaintiff's report and 696 lbs. of cox (cocks) in the Dexter Poultry Company report. In the Dexter Poultry Company report there are 579 lbs. of culls and 29 lbs. of culls in the plaintiff's report. The best and highest priced poultry in each car was that designated as "fowl" and listed at 15 cents in both reports of sale, and also in the "Price-Current;" but in the report of the Dexter Poultry Company it is claimed the defendant received the list price net, and the same, according to the testimony of the defendant, is true of the other classes of poultry. There were 722 lbs. less of the best class of poultry in the car shipped to the plaintiff than there were in the car shipped to the Dexter Poultry Company, although there were 791 lbs. more poultry in the car shipped to the plaintiff.

From this record the poultry in the car shipped to the plaintiff was not as good in quality as the poultry in the car shipped to the Dexter Poultry Company and in neither report is there a designation of "heavy western fowl," the first and highest priced poultry in both reports being designated as "fowl"—apparently the third class in the list as shown by the "Producers' Price-Current" upon which both parties rely. If the first class named is properly designated in each report, the defendant received the current price for that class, namely, for the class designated as "fowl"—15 cents per pound, the list price for that class; for the 1,535 lbs. of leghorn fowl defendant received 9 cents and that is the list price for average leghorn fowl on the 19 and 20 of October; for the 2,803 lbs. of chickens he received 11 cents a pound, the list price in the said publication, except where the chickens are "fancy, mixed with Rocks" and there is no evidence to show that these chickens were not the average chickens which are listed at 11 cents. The plaintiff testified that he sold the poultry at the best price

obtainable for each class of poultry after its arrival and up to the time of sale.

The evidence fails to substantiate the charge of fraud and the findings of fact and conclusions of law of the trial judge are sustained by the evidence.

The judgment is affirmed.

CHRISTIANSON, MORRIS, NUESSLE AND BURR, JJ., concur.